UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                        :

VICKIE TAYLOR,                           :

                               :            12 Civ. 3713 (PAE)

                        Plaintiff,     :

                               :            <u>OPINION & ORDER</u>

                 -v-                  :

                               :

SEAMEN'S SOCIETY FOR CHILDREN,     :

                               :

                      Defendant.     :

                               :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

       Plaintiff Vicki Taylor ("Taylor"), a former employee of defendant Seamen's Society for Children ("Seamen's Society"), brings claims of employment discrimination and retaliation against Seamen's Society under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et. seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 *et seq.* ("NYCHRL"). Taylor alleges that she was discriminated against on the basis of her race and retaliated against for having engaged in a protected act. Seamen's Society denies each claim and now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, the motion is granted.

# I. Background[1]

## A. The Parties

Seamen's Society is a not-for-profit foster care agency funded by the government. Def. 56.1 ¶ 70. Seamen's Society runs several different programs, each of which has its own budget and source of government funding. *Id.* For instance, New York City's Administration for Children's Services ("ACS") funds foster care and preventative programs; the New York City Council funds family day care programs; and Medicaid funds medical/psychiatric programs. *Id.* The costs of administrative departments like Human Resources, IT, and Accounting are "shared across all programs," in that funding for administrative costs is "taken from all of the program budgets." *Id.* ¶ 72.

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' submissions in support of and in opposition to the instant motion, including: Defendant's Local Rule 56.1 Statement ("Def. 56.1") (Dkt. 33); the Affirmation of Marisa C. Wooldridge in Support of Defendant's Motion for Summary Judgment ("Wooldridge Aff.") (Dkt. 28) and attached exhibits; the Affidavit of Anna Opsha in Support of Defendant's Motion for Summary Judgment ("Opsha Aff.") (Dkt. 29); the Affidavit of Nancy Vomero in Support of Defendant's Motion for Summary Judgment ("Vomero Aff.") (Dkt. 30); Plaintiff's Local Rule 56.1 Statement ("Pl. 56.1") (Dkt. 47); the Declaration of Bernadette A. Smith in Opposition to Defendant's Motion for Summary Judgment ("Smith Decl.") (Dkt. 48) and attached exhibits; the Affidavit of Diana Hendrick in Opposition to Defendant's Motion for Summary Judgment ("Hendrick Aff.") (Dkt. 42); and the Affidavit of Vicki Taylor in Opposition to Defendant's Motion for Summary Judgment ("Taylor Aff.") (Dkt. 43). References herein to a paragraph in a party's 56.1 statement incorporate by reference the evidentiary materials cited therein. Where facts stated in a party's Statement of Material Facts are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Taylor, an African-American woman, worked for Seamen's Society between 1985 and 2011.  Taylor Aff. ¶¶ 1, 2; Def. 56.1 ¶ 4; Pl. 56.1 ¶ 169; Opsha Aff. ¶ 28.  She was originally hired by Ann Deinhardt, the Executive Director of Seamen's Society, as a bookkeeper, and for her first three years, she was responsible for accounts payable/receivable, cash disbursements and receipts, bank reconciliations, day care billing, closing books at the end of the month, and preparing expense control worksheets.  Taylor Aff. ¶¶ 2, 6.  She also assisted the senior bookkeeper with accounting for payroll, Tax Deferred Annuity ("TDA"), and pensions.  *Id.* ¶ 6.  Between 1988 and 1992, Taylor performed bookkeeping tasks in connection with health insurance, worker's compensation, life insurance, short and long term disability, pension, TDA, and payroll.  *Id.* ¶ 9.  Starting in 1992, Taylor worked for Virginia Hartie ("Hartie"), Seamen's Society's Human Resources Manager.  *Id.* ¶ 11.

In 1998, Taylor moved back to the Accounting Department, where she reported to Nancy Vomero ("Vomero"), who was, at that time, Seamen's Society's Chief Financial Officer ("CFO").  *Id.* ¶ 12; Def. 56.1 ¶ 10.  In June 2006, Vomero was promoted to Chief Executive Officer ("CEO"), and Taylor began to report to Seamen's Society's new CFO, Margaret Bell ("Bell").  Def. 56.1 ¶¶ 1, 11; Vomero Aff. ¶ 1.  In September 2010, Anna Opsha ("Opsha") replaced Bell as Seamen's Society's CFO, and Taylor began reporting to Opsha.  Def. 56.1 ¶ 39; Opsha Aff. ¶ 1; Taylor Aff. ¶ 51.  In May 2011, Taylor's employment at Seamen's Society was terminated.  Def. 56.1 ¶ 90; Wooldridge Aff. Ex. KK.

**B.    Events Leading to Taylor's First EEOC Complaint**

Taylor's claims arise out of her dealings with various senior executives of Seamen's Society between October 2008 and her termination in May 2011.  As stated above, starting in 1992, Taylor worked for Hartie, who was, at the time, Seamen's Society's Human Resources

Manager.  Taylor Aff. ¶ 11.  During that time, Taylor handled all aspects of employee benefits, including enrolling the employees, making any changes to benefits, and reconciling payroll to ensure the appropriate deductions were taken from an employee's salary to reflect corresponding benefits.  Def. 56.1 ¶ 9.  In 1998, Taylor returned to the Accounting Department and began reporting to Vomero.  *Id.*  In 2006, when Vomero was promoted to CEO, Taylor began to report to the new CFO, Bell.  *Id.* ¶¶ 1, 11; Vomero Aff. ¶ 1.

In 2007, Hartie retired, and Seamen's Society hired Phyllis Davide ("Davide") as the new Director of Human Resources.  Def. 56.1 ¶ 12.  Davide was later promoted to Vice President of Human Resources.  *Id.*  On February 11, 2008, Andrea Montalvo was hired as the Human Resources Generalist to assist Davide.  *Id.* ¶ 16.  In October 2008, Davide, Vomero, and Bell met with Taylor and informed her that the task of enrolling and terminating employees in benefit plans would be transferred to the Human Resources Department.  *Id.* ¶¶ 14, 17.  Vomero and Davide agreed that Taylor would continue to monitor benefit accruals (of personal, sick, and vacation time) and the monthly payments to the pension plan.  *Id.* ¶ 15.  However, Human Resources would take over responsibility for enrolling the employee in the benefit program, ensuring the submission of proper paperwork to the benefit company, handling any changes to the employee's benefit election, and terminating the employee's enrollment in that benefit if the employee elected to withdraw or was terminated.  *Id.* ¶ 18[2]; Vomero Aff. ¶ 39.

In January 2009, Taylor sent Davide a letter, identifying what Taylor believed to be "several incidents involving [racial] discrimination."  Taylor Aff. ¶ 20; Pl. 56.1 ¶ 198; Wooldridge Aff. Ex. B.  The incidents raised in Taylor's letter included, *inter alia*, a female

---

[2] Taylor purports to deny this fact, but only on the grounds that there was not "any specific discussion of the pension account at the October 2008 meeting."  Pl. 56.1 ¶ 18.  Taylor does not deny, or provide any evidence refuting, that these responsibilities for pension accounts were ultimately transferred to the Human Resources Department.

Hispanic secretary whose salary was decreased; an African-American employee whose pay was docked one day; the hiring of two Caucasian secretaries to replace two African-American secretaries; and a reduction in pay for an African-American employee who was transferred to Quality Assurance. Wooldridge Aff. Ex. B. Davide responded in writing, stating that Taylor's "conclusions of discrimination are not justified." Pl. 56.1 ¶ 199; Wooldridge Aff. Ex. C.

On December 16, 2009, Bell provided Taylor with her performance evaluation for the period between July 1, 2008 and June 30, 2009. Pl. 56.1 ¶ 205; Smith Decl. Ex. 14. The choices for overall performance ratings were: (1) improvement needed; (2) valued performance; and (3) exceptional performance. Smith Decl. Ex. 14. Evaluating Taylor, Bell selected "valued performance." *Id.* Her appraisal of Taylor was: "Vickie tries to go out of her way for the employees of Seamen's, even though at time[s] she is overstepping her boundaries." *Id.* In a written response, Taylor stated that she "disagree[d] with your statement of overstepping my boundaries[,] [s]ince your reason is because I talk to employees behind closed doors." *Id.*

A few weeks after receiving her December 16, 2009 performance evaluation, Taylor received another performance evaluation for an overlapping period: between July 1, 2008 and December 31, 2009. Pl. 56.1 ¶ 207; Smith Decl. Ex. 14. The choices for overall performance ratings on the new form were: (1) improvement needed; (2) satisfactory performance; (3) valued performance; and (4) exceptional performance. Smith Decl. Ex. 14. Evaluating Taylor, Bell selected "satisfactory performance." *Id.* Her appraisal of Taylor remained the same, except she added that there had "been discussions on several occasions regarding [Taylor's] lack of timeliness in responding to HR with time sensitive information." *Id.*

On January 15, 2010, Taylor sent a letter to Cara Buonincontri ("Buonincontri"), the Chair of Seamen's Society's Board of Directors. Wooldridge Aff. Ex. D. In the letter, Taylor

discussed an incident at work between Doreen Montalvo and Andrea Montalvo (unrelated), the

handling of which Taylor asserted was discriminatory and reflected a lack of integrity within the

Human Resources Department.  *Id.*  Taylor requested to meet with Buonincontri in person.  *Id.*

On January 26, 2010, Buonincontri responded to Taylor's letter.  Wooldridge Aff. Ex. E.

In relevant part, Buonincontri's letter stated that Taylor's allegations had been investigated, and

that "it has been determined that the facts you presented were inaccurate."  *Id.*  Buonincontri

nonetheless offered to meet, and did meet, with Taylor on February 1, 2010.  After the meeting,

Buonincontri sent Taylor another letter, stating that she had investigated the incidents raised in

Taylor's letter, and "determined that there is no evidence of discrimination."  *Id.*

Sometime in January or February 2010, Taylor was moved out of her private office and

into the office pool.  Def. 56.1 ¶¶ 134–35.

On March 3, 2010, Bell issued Taylor a memorandum recounting a discussion they had

regarding employee benefits.  Def. 56.1 ¶ 26.  The memorandum stated:

> It is Seamen's policy that Human Resources handle all benefits questions.  All
> questions you may be asked should be referred to HR.  As you know, this is
> especially important with questions concerning TDAs.

Wooldridge Aff. Ex. R.

On April 20, 2010, Taylor received a new job description, which she signed.  Def. 56.1

¶ 29; Wooldridge Aff. Ex. T.  Taylor's job description listed her position as "Payroll Specialist"

and summarized her responsibilities as "process[ing] payroll and related duties."  Wooldridge

Aff. Ex. T.  Among her listed duties and responsibilities were to:  review employees' time

sheets; track employees' sick, vacation, and personal business time; process payroll for Seamen's

Society; transmit semi-monthly TDA and pension transactions; track payroll deductions (*e.g.*,

garnishments, parking, flexible spending), prepare monthly pension reports; and perform related payroll reconciliations for accounts receivable and accounts payable. *Id.*

On May 18, 2010, Davide and Bell met with Taylor to discuss her job responsibilities. Def. 56.1 ¶ 30; Smith Decl. Ex. 1 at 104. Taylor accused Bell of bullying her into signing the job description on April 20, 2010. Smith Decl. Ex. 1 at 104–06. After the meeting, Davide concluded in a memorandum that there was not "any intention to bully or threaten . . . . [m]ost probably a misunderstanding on both sides." Wooldridge Aff. Ex. U. Davide also reiterated that Taylor was, going forward, "to perform your job responsibilities as outlined in your current job description." *Id.* After this meeting, Taylor signed a job description that was substantively identical to the April 20, 2010 job description. Wooldridge Aff. Ex. V.

On June 14, 2010, Taylor met with Vomero and Davide about an incident in which Taylor was accused of providing guidance to another employee regarding vacation and sick leave. Def. 56.1 ¶ 33. On June 16, 2010, Davide drafted a Memorandum of Record, signed by Taylor, Vomero, and Davide, which was placed in Taylor's employment file. *Id.* ¶ 34; Wooldridge Aff. Ex. X. The memorandum states:

> I concluded our meeting by referencing our meeting of 5/18/10 where I clarified Vickie's job responsibilities and the proper procedure to take if she came across anything outside her payroll responsibilities. I reminded Vickie that FMLA and any other benefit related issue is outside the scope of her responsibilities and should be referred to HR. Although Vickie at one time handled benefit related issues she no longer has that responsibility and would not necessarily be aware of benefit changes/guidelines therefore Vickie should not relate benefit info to employees. My recommendation would be: "simply tell the employee that is outside of your responsibility and you should speak to your supervisor or HR.["]

Wooldridge Aff. Ex. X.

On June 14, 2010, Taylor filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging discrimination and retaliation based

upon her race and age ("EEOC Charge I").  *See* Wooldridge Aff. Ex. A.  Specifically, Taylor

alleged that, after she wrote letters to Davide and Buonincontri about racial discrimination in the

workplace, Seamen's Society retaliated against her by:  (1) taking away her job duties;

(2) moving her out of her private office; (3) unfairly scrutinizing and criticizing her performance;

and (4) changing her performance evaluation from positive to negative.  *Id.*

On May 13, 2011, the EEOC issued a "Right to Sue Letter," which stated that Taylor's

lawsuit under Title VII or the Age Discrimination in Employment Act ("ADEA") "must be filed

in a federal or state court within 90 days."  Wooldridge Aff. Ex. F.   Taylor did not file a lawsuit

on her claims contained in EEOC Charge I.

### C.    Events After Taylor's First EEOC Complaint

In September 2010, Opsha replaced Bell as CFO of Seamen's Society.  Def. 56.1 ¶ 39;

Opsha Aff. ¶ 1; Taylor Aff. ¶ 51.  Upon joining Seamen's Society, Opsha conducted a review of

the Accounting Department, meeting with each employee and asking them to write down their

job duties, so that she "could properly evaluate the department."  Def. 56.1 ¶ 42; Opsha Aff. ¶ 4.

Opsha later stated that she had "a very different outlook on management" than Bell, and that she

"prefer[red] to address issues immediately and repeatedly until performance improves."  Opsha

Aff. ¶ 5.  For example, on September 9, 2010, Opsha issued a warning to Doreen Montalvo

regarding excessive absenteeism.  Def. 56.1 ¶ 98; Opsha Aff. ¶ 6.  Opsha also placed Montalvo

on a 30-day probation, gave her three written employee counselings due to excessive

absenteeism (Dec. 23, 2010, Jan. 13, 2011, and Nov. 10, 2011), and provided written warnings

on two other occasions for disclosing confidential information (Jun. 16, 2011 and Nov. 10,

2011).  Def. 56.1 ¶ 99.

On September 30, 2010, Opsha gave Taylor a written counseling for advising an employee on Seamen's Society's sick leave policy.  Def. 56.1 ¶ 50; Wooldridge Aff. Ex. L at 130–31.  The counseling stated:

> As revealed by one of the employee[']s e-mails to HR on September 30, 2010, Ms. Taylor continues to advise employees on their benefits.  Employee benefits are not a payroll function.  All benefit inquiries from employees should be directed to HR.  Ms. Taylor was advised multiple times in the past that employee benefits are outside of the scope of her responsibilities.

Wooldridge Aff. Ex. Y.  The corrective action was to "not advise other employees on their benefits" and to direct all benefits inquiries to HR.  *Id.*

On November 17, 2010, Taylor received a new job description from Opsha.  Def. 56.1 ¶ 48; Wooldridge Aff. Ex. Z.  This job description—for "Payroll Bookkeeper"—included the following duties and responsibilities:  (1) process semi-monthly payroll; (2) review employees' time sheets; (3) monitor garnishments and flexible spending; and (4) enter day care provider payroll information into Soft Care for payment.  Wooldridge Aff. Ex. Z.  The description also added as a qualification an "Associates degree and prior payroll experience."  *Id.*  On November 24, 2010, Taylor signed the job description, but noted that she "disagree[d] with the new [Associates degree] qualification."  *Id.*

On April 21, 2011, Taylor received another employee counseling from Opsha for advising an employee's supervisor that the employee could not take a half-day as a sick day. Def. 56.1 ¶ 112; Opsha Aff. ¶ 13; Wooldridge Aff. Ex. CC.  The counseling stated:

> It has come to my attention that, despite having been expressly advised not to do so in the past, Ms. Taylor continues to advise employees on how to handle issues on vacation, personal, and sick time. . . . Ms. Taylor should not be giving any directives to employees from other departments.  She was instructed multiple times to bring all the issues and discrepancies to my attention and not to advise other employees on any issues.

Wooldridge Aff. Ex. CC.

### 1.   Automation of the Payroll System

A few months after Opsha became CFO in September 2010, she suggested to Vomero that Seamen's Society should automate its payroll system.  Def. 56.1 ¶¶ 39, 54; Opsha Aff. ¶ 20; Vomero Aff. ¶ 18.  Opsha later testified that she believed a fully automated payroll system would be more cost-efficient and accurate.  Opsha Aff. ¶ 20.  Opsha's prior employment as an auditor for other not-for-profit corporations had exposed her to automated payroll systems, in which employees electronically punch in and out each day and timecards are automatically generated.  Def. 56.1 ¶ 55.  Opsha believed that such a system would eliminate the need for:  (1) employees to hand-write their time; (2) supervisors to review that time; and (3) accounting to cross-check that time with accruals in the payroll system and to work out discrepancies.  *Id.*  Under the automated system, employees would no longer need to write times into their time card, because the automated system would require employees to physically sign in and out with a swipe of their finger.  *Id.* ¶ 56; Wooldridge Aff. Ex. MM.  Vomero encouraged Opsha to look into the idea.  Vomero Aff. ¶ 19.

Opsha asked ADP, a payroll processing company already working for Seamen's Society, to provide a proposal for a fully automated payroll system.  Def. 56.1 ¶ 58.  On April 15, 2011, ADP presented its proposal to Opsha, Vomero, Davide, and Margaret O'Toole ("O'Toole"), the Chief Operating Officer ("COO").  *Id.* ¶ 60.  This group decided that the new ADP system would meet the company's payroll needs at reduced costs and higher efficiency.  *Id.* ¶ 61.[3]

---

[3] Taylor denies that there were "any conclusions reached about reduced costs which require a number of other factors to be considered."  Pl. 56.1 ¶ 61.  However, Taylor was not a participant in this conversation, and she does not dispute, and the evidence uniformly indicates, that Opsha, Vomero, Davide, and O'Toole believed that the new ADP system would both reduce the costs and increase the efficiency of Seamen's Society's payroll function.

Accordingly, Seamen's Society entered into a contract with ADP.  *Id.* ¶ 62.  The new payroll system became operational on July 1, 2011.  *Id.* ¶ 61.[4]

Seamen's Society's "fiscal year" runs from July 1 to June 30 of each year.  Def. 56.1 ¶ 69.  For fiscal year 2011 (July 1, 2010 to June 30, 2011), before the implementation of the new ADP system, Seamen's Society paid ADP $24,710.93.  *Id.* ¶ 64; Opsha Aff. ¶ 24; Wooldridge Aff. Ex. PP.  For fiscal year 2012 (July 1, 2011 to June 30, 2012), after the new ADP system was installed, Seamen's Society paid ADP $41,594.26.  Def. 56.1 ¶ 64; Opsha Aff. ¶ 24; Wooldridge Aff. Ex. PP.  Seamen's Society thus paid ADP $16,883.33 more for the year after implementing the new payroll system.  Def. 56.1 ¶ 64.  As of the time her employment was terminated, Taylor earned approximately $45,000 per year.  *Id.* ¶ 65.

### 2.  Taylor's Termination

In both 2010 and 2011, Seamen's Society implemented a reduction in force ("RIF"). Def. 56.1 ¶ 78; Vomero Aff. ¶¶ 10–11.  These RIFs were triggered for two reasons:  (1) to adjust for reduced government funding (caused by reduced reimbursement rates or fewer families served); or (2) to reduce administrative costs.  Def. 56.1 ¶¶ 78–79.  As discussed above, each of Seamen's Society's programs has its own budget and source of funding, but common administrative costs (like HR, IT, and Accounting) are shared across all programs.  *Id.* ¶¶ 70, 72; Romero Aff. ¶¶ 4, 6.  ACS is Seamen's Society's single largest source of funding.  Def. 56.1 ¶ 70; Romero Aff. ¶ 4.  ACS does not, however, provide Seamen's Society with a fixed amount of funding each year; instead, it provides grants for services at rates that may change at a later

---

[4] Taylor disputes that Seamen's Society "automated" its payroll function in 2011, Pl. 56.1 ¶ 63, but acknowledges that ADP implemented a payroll system that replaced paper timecards with a automatic finger scan system, *id.* ¶ 64.  It is unnecessary to parse the term "automation" so finely; with no evidence to the contrary, the Court accepts as true the fact that Seamen's Society entered into a contract with ADP in April 2011 to upgrade its payroll system with the functions described above.

date.  Def. 56.1 ¶ 76; Romero Aff. ¶ 10.  Seamen's Society calculates its budget each year based on the services it provides and the anticipated reimbursement rate from ACS.  Def. 56.1 ¶ 76.

In June 2010, Seamen's Society implemented a RIF ("RIF 10"), triggered by the City's decision not to renew a contract for the Department of Health AIDS program, and by reductions in funding from ACS and the New York City Council.  *Id.* ¶¶ 80–81.[5]  Seamen's Society cut 17 positions during RIF 10.  *Id.* ¶ 81; Wooldridge Aff. Ex. JJ.  The terminated employees came primarily from the programs affected by the funding cuts, as well from the Quality Assurance ("QA") department.  Def. 56.1 ¶ 81; Wooldridge Aff. Ex. JJ.  Of the 17 employees terminated, nine were African-American, four were Caucasian, three were Hispanic, and one was listed as "2+races."  Wooldridge Aff. Ex. JJ.

Seamen's Society implemented a second RIF in May 2011 ("RIF 11"), triggered by another decrease in the budget.  Def. 56.1 ¶ 83.  The ACS Preventive Program budget for Seamen's Society's Family Rehabilitation Program went from 50 slots in fiscal year 2011 to 30 slots in fiscal year 2012.  *Id.* ¶ 84(a); Wooldridge Aff. Exs. EE, FF.  Also, the Family Day Care budget went from 284 slots in fiscal year 2011 to 235 slots in fiscal year 2012.  Def. 56.1 ¶ 84(b); Wooldridge Aff. Exs. GG, HH.  Finally, the reimbursement rate for one of Seamen's Society's contracts went from $77.60 per slot in fiscal year 2011 to $68.46 per slot in fiscal year 2012.  Def. 56.1 ¶ 84(c); Wooldridge Aff. Ex. II.

Eight positions were cut during RIF 2011.  Def. 56.1 ¶ 90.  Five of the eight terminated employees occupied "direct-care" positions, meaning that they worked directly for one of Seamen's Society's social services programs.  *Id.* ¶ 91; Wooldridge Aff. Ex. KK.  Of these five,

---

[5] Def. 56.1 ¶ 81 states that the RIF occurred in May and June 2011, but the Court assumes that this was a typographical error, as the evidence cited for this point, Vomero Aff. ¶ 13, states that the RIF occurred in May and June 2010.

two were Caucasian, two were Hispanic, and one was African-American.  Wooldridge Aff. Ex. KK.  The other three terminated employees worked for administrative departments.  Def. 56.1 ¶ 91; Wooldridge Aff. Ex. KK.  Of these three, one was a Caucasian woman (Diana Hendrick ("Hendrick")), one was an Asian man (Surujpaul Singh ("Singh")), and one was Taylor.  Wooldridge Aff. Ex. KK.  Hendrick was employed as an office manager and was originally hired by Seamen's Society in 1985 (eight months after Taylor).  *Id.*  Singh was employed as a driver and was originally hired by Seamen's Society in 1997.  *Id.*  On May 16, 2011, Taylor and Singh were informed of their terminations; on May 23, 2011, Hendrick was informed of her termination.  *Id.*

RIF 11 occurred at around the time Seamen's Society entered into a new contract with ADP, and Vomero testified that the cost savings of automation were taken into account in deciding which employees to terminate.  Vomero Aff. ¶ 24; Def. 56.1 ¶¶ 89.[6]  This rationale is also reflected in the termination letter provided to Taylor, which stated:

> Due to budgetary constraints, our organization has determined it is necessary to reduce overhead expenses and eliminate several positions.  As part of this effort, the agency has decided to implement a new automated time and attendance system and will outsource the entire payroll function to ADP.  This will result in a substantial savings and streamlined, more efficient, less time intensive payroll processing for the Agency.  As a result, your position as Payroll Specialist will be eliminated and you will not be replaced.
>
> Please be aware that this decision is no reflection on your job performance.  Your service at Seamen's Society for Children and Families is very much appreciated.

Wooldridge Aff. Ex. QQ; Def. 56.1 ¶ 144.

---

[6] Taylor denies this point, but has not cited any contrary evidence that would support the contrary inference.  Pl. 56.1 ¶ 89.  The Court therefore treats this material fact as true.

### D.  Taylor's Second EEOC Charge

On August 3, 2011, Taylor filed a second charge of discrimination with EEOC, alleging that her employment with Seamen's Society had been terminated due to race discrimination and/or retaliation ("EEOC Charge II").  *See* Wooldridge Aff. Ex. G.  The Charge stated that it "incorporate[d] by reference all of the information contained in Paragraphs 1 through 33 in [her] earlier Charge."  *Id.* ¶ 6.  On February 13, 2012, the EEOC issued a "Right to Sue Letter," which gave Taylor 90 days to file suit.  Wooldridge Aff. Ex. H.

### E.  Procedural History

On May 9, 2012, Taylor filed the Complaint in this case, alleging employment discrimination on the basis of race and retaliation under Title VII, the NYSHRL, and the NYCHRL.  Dkt. 1.  On April 18, 2013, following discovery, Seamen's Society filed the present motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, Dkt. 27, and a supporting memorandum of law, Dkt. 32 ("Def. Br.").  On May 29, 2013, Taylor filed a memorandum of law in opposition to that motion.  Dkt. 44 ("Pl. Br.").  On June 19, 2013, Seamen's Society filed a reply brief.  Dkt. 40 ("Def. Repl. Br.").  On July 30, 2013, the Court heard argument.  *See* Transcript of Oral Argument ("Tr.").

## II.  Legal Standard

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

Where a plaintiff has made allegations of discriminatory retaliation, courts must use "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence."  *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted); *see also Chin-McKenzie v. Continuum Health Partners*, 876 F. Supp. 2d 270, 280 (S.D.N.Y. 2012).  However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).  Thus, even in such cases, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."  *Holcomb*, 521 F.3d at 137.

### III.    Discussion

Taylor brings claims for (1) race discrimination and (2) retaliation under Title VII, the NYSHRL, and the NYCHRL.  Seamen's Society moves for summary judgment on all claims.

### A.    Timeliness

As a threshold matter, Seamen's Society argues that any claims contained in Taylor's first EEOC charge are time-barred, because Taylor failed to file suit within 90 days of the EEOC's right to sue letter.  Def. Br. 4–6.  Taylor concedes this point.  *See* Pl. Br. 15–16 ("the relief plaintiff is seeking on wrongful discrimination and termination in retaliation for her complaints against Bell, Vomero and Opsha, not the acts which are described in plaintiff's first EEOC charge"); *see also* Tr. at 15.  Taylor, however, asserts that she may use past acts as background evidence in support of timely claims for racial discrimination and retaliation.  Pl. Br. 16 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)).  Seamen's Society disagrees, asserting that because Taylor did not file suit based on EEOC Charge I, the Court is barred entirely from considering events that occurred before June 14, 2010 (when she filed EEOC Charge I), even as background evidence for claims it concedes are timely.  Def. Rep. Br. 3–4.

Taylor is correct as to this point.  To be sure, Taylor's decision not to file suit on her first EEOC Charge means that the allegedly discriminatory acts Seamen's Society committed before June 14, 2010—transferring Taylor's job duties, moving her out of her office, overly scrutinizing her performance, and changing her performance evaluation to make it more negative—are time-barred.  They are thus not independently actionable as adverse employment actions.  *See Morgan*, 536 U.S. at 113 (stating, in context of Title VII statute of limitations, that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in

timely filed charges").  But Taylor's suit is not based on the pre-June 14, 2010 events; rather, the gravamen of her Complaint is that she was terminated from her job on May 16, 2011 due to racial discrimination and/or retaliation.  In evaluating these claims, the finder of fact may consider all relevant evidence, subject, of course, to the standards set by the Federal Rules of Evidence.  The background evidence that may be relevant Taylor's termination may conceivably include events that occurred earlier in Taylor's employment—including events reported in her first EEOC Charge, as to which a freestanding claim would be time-barred.  *See Morgan*, 536 U.S. at 113 (the statute does not "bar an employee from using the prior acts as background evidence in support of a timely claim"); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176 (2d Cir. 2005) (concluding that the District Court "impermissibly barred [plaintiff] from relying on the [time-barred] adverse employment acts as background evidence to support the actionable claims"); *Jute*, 420 F.3d at 177 (stating that events, "although not actionable because" of the statute of limitations, "might nonetheless remain admissible at trial and could lead a rational jury to find a causal link between the protected activity and the actionable adverse acts"); *Petrosino v. Bell Atlantic*, 385 F.3d 210, 220 (2d Cir. 2004) ("[E]vidence of earlier[, time-barred] promotion denials may constitute relevant background evidence in support of a timely claim, and we will consider [them] as such.") (citation omitted).

It is no answer for Seamen's Society to note that the cases above concerned a different limitations period under Title VII: the requirement that an EEOC Charge be filed within 180 or 300 days of a discriminatory act, as opposed to the requirement here, to file suit within 90 days of the right-to-sue letter.  The relevant proposition—that evidence bearing on time-barred claims is not thereby inadmissible in connection with the adjudication of timely claims—applies equally.  And Seamen's Society cites no authority supporting its claim that the Court may not

consider, in resolving any of Taylor's claims, events in Taylor's employment history that preceded EEOC Charge I.  The cases it cites instead support only the proposition that conduct of Seamen's Society embraced by Taylor's first EEOC Charge is no longer actionable under Title VII.  Several cases cited by Seamen's Society in fact support Taylor's assertion that she can use such prior events to support her timely Title VII claims.  *See, e.g.*, *Carmellino v. Dist. 20 of the N.Y. City Dep't of Educ.*, No. 03 Civ. 5942 (PKC), 2006 WL 2583019, at *8 (S.D.N.Y. Sept. 6, 2006) ("In all events, facts occurring outside the limitations period may be relevant as 'background evidence' to claims arising within the limitations period.") (citation omitted); *Madray v. Long Is. Univ.*, No. 10 Civ. 3841 (ADS) (WDW), 2012 WL 2923500, at *10 (E.D.N.Y Jul. 16, 2012) (plaintiff's "denial of tenure" claim, which is time-barred, "is relevant evidence to the Plaintiff's [timely] constructive discharge claim").

The Court therefore is at liberty to, and will consider, relevant events from Taylor's employment history in assessing her timely claims, whether brought under Title VII, the NYSHRL, or the NYCHRL.

### B.      Race Discrimination Under Title VII

Seamen's Society moves, first, for summary judgment on Taylor's Title VII race discrimination claim.

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1) (emphasis added).  When there is no direct evidence of discrimination, claims under Title VII are guided by the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this analysis, the

plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  To do so, Taylor must show that:  (1) she was within the protected class, (2) she was qualified for the position, (3) she experienced an adverse employment action, and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012) (citing *Gorzynski v. JetBlue Airways, Corp.*, 596 F.3d 93, 107 (2d Cir. 2010)).  "This burden is not a heavy one."  *Id.*  However, a plaintiff cannot establish a *prima facie* case based on "purely conclusory allegations of discrimination, absent any concrete particulars."  *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. denied,* 474 U.S. 829 (1985).

If the plaintiff can demonstrate a *prima facie* case, "the burden of production shifts to the employer to articulate a legitimate, clear, specific and non-discriminatory reason" for having undertaken the adverse action.  *Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996).  "[I]f the defendant satisfies this burden of production, the plaintiff has the ultimate burden to prove that the employer's reason was merely a pretext for discrimination."  *Id.*  A plaintiff is not "required to prove the prohibited motivation was the sole or even the principal factor in the decision, or that the employer's proffered reasons played no role in the employment decision."  *Finn v. N.Y. State Office of Mental Health Rockland Psychiatric Ctr.*, No. 08 Civ. 5142 (VB), 2011 WL 4639827, at *11 (S.D.N.Y. Oct. 6, 2011) (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 78 (2d Cir. 2001)).  Instead, the plaintiff "must show that those were not the only reasons and that plaintiff's protected status contributed to the employer's decision."  *Id.*

Here, Seamen's Society makes two principal arguments.  First is that the evidence does not establish a *prima facie* case of racial discrimination, because the circumstances of Taylor's termination do not give rise to an inference of discrimination.  *See* Def. Br. 8–11.  Second is that,

even assuming a *prima facie* case, Seamen's Society has met its burden of proffering legitimate, non-pretextual reasons for terminating her. *See id.* 12–14.  These were that (1) Taylor's position as a payroll specialist became redundant when Seamen's Society automated its payroll system, and (2) budget cuts necessitated a reduction in force. *Id.*  The Court considers these arguments in turn.

### 1.   Taylor has failed to establish a *prima facie* case of race discrimination

It is undisputed that Taylor is a member of a protected class and was qualified for her position.  Thus, to make out a *prima facie* case, Taylor must establish that she was subject to an adverse employment action, and that this action took place under circumstances giving rise to an inference of discrimination based upon her race.

#### a.   Taylor has established one adverse employment action—her termination on May 16, 2011

An adverse employment action is a "materially adverse change in the terms and conditions of employment." *Sanders v. N.Y. City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (citation omitted).  "To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (citation omitted).  "Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.*; *see also Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004).

Taylor has undisputedly established one adverse employment action that she may timely pursue: her termination on May 16, 2011.  Termination of employment is the quintessential

materially adverse employment action under Title VII.  *See Williams*, 368 F.3d at 128; *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998).

Taylor also attempts to assert two other adverse employment actions:  (1) changes to her job description; and (2) employee counselings after June 14, 2010.  Neither, however, materially affected the terms and conditions of Taylor's employment, and thus, neither constituted an adverse employment action under Title VII.

Taylor's job description changed three times.  The first change occurred on April 20, 2010.  Def. 56.1 ¶ 29; Wooldridge Aff. Ex. T.  The second change occurred on May 18, 2010. Def. 56.1 ¶ 32; Wooldridge Aff. Ex. V.[7]  Even assuming *arguendo* that these two job descriptions resulted in an adverse employment action, however, they both predated EEOC Charge I (filed on June 14, 2010), and thus neither may be the basis for Taylor's Title VII race discrimination claim.  The third change post-dated EEOC Charge I; it occurred on November 17, 2010.  Def. 56.1 ¶ 48; Wooldridge Aff. Ex. Z.  Seamen's Society then changed Taylor's job description, so as to now describe her position as "Payroll Bookkeeper"; her listed duties and responsibilities were to (1) process semi-monthly payroll; (2) review employees' time sheets; (3) monitor garnishments and flexible spending; (4) enter day care provider payroll information into Soft Care for payment.  Wooldridge Aff. Ex. Z.  Four duties listed on the May 18, 2010 job description, however, were eliminated, and did not appear on the November 17, 2010 job description: to (1) monitor employees' sick, vacation, and personal time; (2) reconcile and transmit, semi-monthly, TDA and pension loan payments; (3) transmit annual pension payments; and (4) reconcile general ledger payroll accounts.  *See* Wooldridge Aff. Exs. V, Z.

---

[7] The job descriptions signed on April 20, 2010 and May 18, 2010 were substantively identical. *See* Wooldridge Aff. Exs. T, V.

Taylor asserts that the elimination of these four job duties amounted to an adverse employment action.  However, Taylor presents no evidence that the new job description resulted in a decreased wage or salary, a less distinguished title, a material loss of benefits, or significantly diminished material responsibilities.  *See Mathirampuzha*, 548 F.3d at 78.  Her earlier job title was "Payroll Specialist"; her later job title was "Payroll Bookkeeper." Wooldridge Aff. Exs. V, Z.  The job summary for both descriptions was "payroll processing"; in both, Taylor is listed as working in the Accounting Department and reporting to the CFO. Wooldridge Aff. Exs. V, Z.  The substance of Taylor's duties also stayed the same—to review time sheets and process payroll.  Taylor asserts that, "[a]s a result of the new job description, [Taylor's] work load . . . decreased significantly."  Compl. ¶ 39.  But Taylor does not point to any evidence to support this assertion.  Opsha's decision, as the new CFO, to provide an employee, Taylor, with a new job description does not, without more, constitute an adverse employment action.  *See Sanders*, 361 F.3d at 755 ("To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.") (citation omitted).

Taylor also asserts that her two written counselings after June 14, 2010 amount to adverse employment actions.  On September 30, 2010, Opsha gave Taylor a written counseling for advising an employee on Seamen's Society's sick-leave policy.  Def. 56.1 ¶ 50.  On April 21, 2011, Opsha gave Taylor a written counseling for advising an employee's supervisor that the employee could not take a half-day as a sick day.  Def. 56.1 ¶ 112.   Neither of these two instances of routine discipline, however, constituted a "materially adverse change" in the terms and conditions of Taylor's employment sufficient to sustain a Title VII discrimination claim. *See James v. Countrywide Fin. Corp.*, 849 F. Supp. 2d 296, 310 (E.D.N.Y. 2012) (providing two

written counseling forms to plaintiff did not constitute an adverse employment action under Title VII); *Gear v. Dep't of Educ.*, No. 07 Civ. 11102 (NRB), 2011 WL 1362093, at *3 (S.D.N.Y. Mar. 30, 2011) (allegations that plaintiff was "summoned to disciplinary meetings" insufficient to maintain Title VII claim); *Hill v. Children's Vill.,* 196 F. Supp. 2d 389, 397 (S.D.N.Y. 2002) (plaintiff's receipt of warning letter, without more, was "insufficient to create a tangible employment detriment").

The evidence therefore establishes just one timely adverse employment action—Taylor's termination on May 16, 2011.  The Court now turns to whether Taylor has established facts that give rise to an inference that she was terminated *because of* her race.

### b.  Taylor has failed to establish that Taylor's termination was because of her race

The "*sine qua non* of a . . . discriminatory action claim under Title VII is that the discrimination must be *because of*" the employee's protected characteristic.  *Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007) (citation omitted) (emphasis in original); *see also Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work . . . is actionable under Title VII only when it occurs *because of* an employee's . . . protected characteristic.") (emphasis added).  The only relevant facts to which Taylor points to show that she was terminated *because of* her race are that:  (1) she was the only African-American woman in the Accounting Department since 2000; and (2) Doreen Montalvo, a Caucasian employee, was not subjected to the same level of discipline from Opsha and was not terminated.

As to the former, the fact that Taylor was the only African-American in the Accounting Department does not give rise to an inference of discrimination.  Statistical evidence can, in some cases, lead to an inference of discrimination.  *See Leibowitz v. Cornell*, 584 F.3d 487, 502–03 (2d Cir. 2009).  But not here: that Taylor was the sole African-American woman in the

Accounting Department of a relatively small non-profit organization does not, without more, give rise to an inference that she was terminated because of her race.

The context of Taylor's termination, in any event, further undermines such an inference. It is undisputed that Taylor was terminated as part of a reduction in force (RIF 11), which led to the termination of seven other employees.  Def. 56.1 ¶ 90.  Of the eight terminated employees, three were Caucasian, two were Hispanic, one was Asian, and two were African-American, meaning that five were from minority groups.  Wooldridge Aff. Ex. KK.  Even during a workforce reduction, "an employer may not dismiss employees for unlawful discriminatory reasons."  *Leibowitz*, 584 F.3d at 504 (citing *Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*, 964 F.2d 106, 111 (2d Cir. 1992)); in *Leibowitz*, for example, the Second Circuit found it significant that every faculty member or staff employee terminated during a reduction in force was a female over the age of 50.  584 F.3d at 503.  But here, the statistical evidence is not nearly as telling.  And if the focus is narrowed to the three employees terminated from administrative departments, the statistical evidence is even less suggestive of discrimination.  One was Taylor, an African-American woman, but the other two were Hendrick, a Caucasian woman, and Singh, an Asian man.  Wooldridge Aff. Ex. KK.  That the three employees terminated from Seamen's Society's administrative staff were each from a different racial group does not support an inference of racial discrimination.  It is, if anything, consistent with an equal-opportunity reduction in force.

As to the contrast Taylor seeks to draw with Doreen Montalvo ("Montalvo"), the evidence does not support an inference of race-based unequal treatment.  Taylor claims she was treated less favorably than Montalvo, who is Caucasian. However, a plaintiff seeking to establish a *prima facie* case of racial discrimination by means of proof of disparate treatment must show

that "she was similarly situated in all material respects" to the persons with whom she seeks to compare herself.  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citation omitted).  What constitutes "all material respects" varies, of course, from case to case, but "the plaintiff and those [s]he maintains were similarly situated [must have been] subject to the same workplace standards."  *Id.* at 40.  This requires "a reasonably close resemblance of facts and circumstances."  *Id.*; *see also McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) ("[W]here a plaintiff seeks to establish the minimal *prima facie* case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination.").

Here, Taylor and Montalvo are not, by any means, similarly situated in all material respects.  At the time of Taylor's termination, Montalvo worked in "Accounts Payable," Pl. 56.1 ¶ 215, while Taylor was a "Payroll Bookkeeper," Wooldridge Aff. Ex. Z.  Taylor's area of responsibility—to review time sheets and process payroll—was made redundant by the new payroll system implemented by ADP in May 2011.  But Taylor points to no evidence that the "Accounts Payable" area was similarly impacted by technological changes to the ADP payroll system.  Further, to the extent that Taylor's disparate treatment argument is based on the claim that she was subjected to closer scrutiny or harsher discipline than Montalvo, the record evidence is to the contrary.  Taylor received two written counselings from Opsha—Montalvo received three written counselings due to excessive absenteeism (on Dec. 23, 2010, Jan. 13, 2011, and Nov. 10, 2011), and two other written warnings for disclosing confidential information (on Jun. 16, 2011 and Nov. 10, 2011).  *See* Def. 56.1 ¶ 99.  Opsha also put Montalvo on a 30-day probation in January 2011.  *Id.*  In any case, because Taylor and Montalvo were not similarly

situated with respect to their job responsibilities, an inference of discrimination cannot fairly be drawn from the fact that Taylor was terminated and Montalvo was not.

Even viewing the evidence in the light most favorable to her, Taylor has failed to present evidence that would permit a reasonable jury to find that her termination was the product, in whole or part, of discrimination based on race.  Taylor, therefore, has failed to establish a *prima facie* case of racial discrimination under Title VII.

### 2. Seamen's Society has put forward a neutral justification for Taylor's termination

Even if Taylor could make out a *prima facie* case of race discrimination, however, Seamen's Society has established two legitimate, non-discriminatory business justifications for Taylor's termination, *see McDonnell Douglas Corp.*, 411 U.S. 792.  First, Taylor's position became redundant when Seamen's Society further automated its payroll function.  Second, Taylor was terminated as part of a reduction in force prompted by Seamen's Society's budgetary shortfalls.  Defendants have adduced substantial documentary and testimonial evidence as to each; specifically, that Seamen's Society decided to further automate its payroll function in 2011, and that budgetary shortfalls for fiscal year 2012 brought about the reduction in force that encompassed Taylor.

As to the former, it is undisputed that Seamen's Society entered into a contract with ADP to upgrade its payroll function, which was to be completed by July 1, 2011.  Def. 56.1 ¶¶ 60–62.  The new system eliminated the need for employees to hand-write their time onto time cards, and enabled employees to physically sign in and out with a swipe of a finger.  *Id.* ¶ 56; Wooldridge Aff. Ex. MM.  Because the system automatically generated timecards for each employee, there was no need for an employee to crosscheck the timecard with accruals in the payroll system and to work out discrepancies.  Def. 56.1 ¶ 55; Wooldridge Aff. Ex. MM.  The leadership of

Seamen's Society believed that this system would result in a more cost-efficient and accurate payroll function.  Def. 56.1 ¶ 54.

It is also undisputed that, in May 2011, Seamen's Society implemented a reduction in force in due to budgetary shortfalls.  Def. 56.1 ¶ 83.  Seamen's Society has come forward with detailed evidence of its reduced government funding for fiscal year 2012.  For instance, the ACS Preventive Program budget for Seamen's Society's Family Rehabilitation Program went from 50 slots in fiscal year 2011 to 30 slots in fiscal year 2012.  Def. 56.1 ¶ 84(a); Wooldridge Aff. Exs. EE, FF.  And the Family Day Care budget went from 284 slots in fiscal year 2011 to 235 slots in fiscal year 2012.  Def. 56.1 ¶ 84(b); Wooldridge Aff. Exs. GG, HH.  Finally, the reimbursement rate for one of Seamen's Society's contracts went from $77.60 per slot in fiscal year 2011 to $68.46 per slot in fiscal year 2012.  Def. 56.1 ¶ 84(c); Wooldridge Aff. Ex. II.[8]  The reduced budget led Seamen's Society to implement the reduction in force that resulted in the termination of eight positions.  Def. 56.1 ¶ 90.  Five of the terminated employees occupied "direct-care" positions, meaning that they worked directly for one of Seamen's Society's social services programs.  Def. 56.1 ¶ 91.  The other three worked for administrative departments.  *Id*.; Wooldridge Aff. Ex. KK.

Seamen's Society asserts that Taylor's termination was caused by these two events, not racial discrimination.  The timing of these events is consistent with this claim:  The reduction in force occurred at around the same time as Seamen's Society entered into a new contract with ADP, *see* Def. 56.1 ¶ 88, and the "cost savings of the payroll automation were taken into

---

[8] Taylor vaguely claims that this evidence does not reflect Seamen's Society's "actual financial position," Pl. Br. 22, but Taylor adduces no actual evidence to dispute the documentary and testimonial evidence provided by Seamen's Society.  The Court thus treats as true the fact that Seamen's Society suffered a budgetary shortfall for fiscal year 2012.

account" in deciding which employees to terminate. Def. 56.1 ¶ 89;[9] *see also* Vomero Aff. ¶ 28

(attesting that Taylor's position "was cut because the automation of ADP removed all of her

payroll job duties, and the other minor responsibilities she handled . . . were absorbed by the

remaining staff").  The evidence thus convincingly shows that:  (1) Seamen's Society's financial

situation caused it to cut its costs by reducing its workforce; (2) in deciding which positions to

terminate, Seamen's Society had to determine which positions were most expendable; and

(3) Taylor's position became expendable when Seamen's Society automated its payroll function

through ADP.  This is, in fact, the rationale recited in Taylor's termination letter:

> Due to budgetary constraints, our organization has determined it is necessary to reduce overhead expenses and eliminate several positions.  As part of this effort, the agency has decided to implement a new automated time and attendance system and will outsource the entire payroll function to ADP.  This will result in a substantial savings and streamlined, more efficient, less time intensive payroll processing for the Agency.  As a result, your position as Payroll Specialist will be eliminated and you will not be replaced.

> Please be aware that this decision is no reflection on your job performance.  Your service at Seamen's Society for Children and Families is very much appreciated.

Wooldridge Aff. Ex. QQ.

Seamen's Society has thus met its burden to articulate neutral, non-discriminatory

reasons for terminating Taylor.

### 3.   Taylor has failed to show that Seamen's Society's neutral, non-discriminatory reasons are pretextual

Taylor asserts that "there is substantial evidence that Seamen's proffered justifications for

eliminating [her] position and firing her are pretextual."  Pl. Br. 18.  But Taylor has failed to

point the Court to any such evidence.  Instead, she reiterates the claim that Opsha overly

---

[9] Taylor denies this point, but does not cite to any contrary evidence.  Pl. 56.1 ¶ 89.  The Court thus treats this fact as true.

scrutinized her performance and stripped her of tasks that "did not fit under the title of Payroll Specialist." *Id.* 19–21.  In support of her claim that Seamen's Society's reasons for terminating her were mere pretext, Taylor makes three, largely conclusory, assertions: that (1) terminating Taylor did not actually save Seamen's Society any money; (2) Angela Angell ("Angell") was hired as Taylor's replacement; and (3) the other administrative employees terminated in the 2011 RIF were "collateral damage" in Seamen's Society's campaign to terminate Taylor.  The Court addresses these claims in turn.

First, Taylor asserts that the payroll system was already automated and that terminating Taylor would not actually save Seamen's Society any money.  She thereby claims that Seamen's Society is mistaken (or dishonest) in its stated belief that it would save money by automating its payroll system and terminating Taylor.  But Seamen's Society has provided solid evidence that the new automated payroll system cost it an additional $16,883.33 in fiscal year 2012, *see* Def. 56.1 ¶ 64; Wooldridge Aff. Ex. PP, and it is undisputed that Taylor's salary was approximately $45,000 per year when she was terminated, *see* Def. 56.1 ¶ 65.  Taylor has not pointed to any evidence to rebut this claim.  Taylor has suggested an alternative method of calculating the cost of retaining her:  She proposes to multiply her hourly rate of pay by the number of hours she estimates spending on payroll processing, and to compare this amount to the additional costs of the ADP system, plus the costs of transferring some of her duties to Opsha, whose salary is higher than Taylor's.  Taylor Aff. ¶¶ 68–70.  But courts "may not second-guess an employer's non-discriminatory business decisions, regardless of their wisdom, unless there is actual evidence that they were motivated by discrimination."  *Peters v. Mount Sinai Hosp.*, No. 08 Civ. 7250 (CM), 2010 WL 1372686, at *9 (S.D.N.Y. Mar. 30, 2010) (citing *Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100, 106 (2d Cir. 1989)).  And, as noted above, there is no actual

evidence that Seamen's Society's decision to terminate Taylor was motivated by discrimination. The Court therefore will not second-guess Seamen's Society's determination that further automating their payroll through ADP and terminating Taylor would result in cost savings.

Second, Taylor asserts that Angell was hired as her replacement. On this premise, she asserts, Seamen's Society's budgetary reasons for terminating her position were mere pretext. Pl. Br. 25. The record, however, reflects that Angell's job duties were not payroll-related. To the contrary, Angell testified that her job duties were mainly those of an administrative assistant, such as sorting the mail, checking the location of employees for the interoffice messenger, ordering office supplies, scheduling job interviews, making photocopies, entering data, and filing. Smith Decl. Ex. 7 at 34–42. Taylor points to no evidence that Angell performed any payroll functions that were automated by ADP in April 2011.

Finally, Taylor asserts that the other two administrative employees who were terminated in the 2011 RIF, Hendrick and Singh, were "collateral damage" to Seamen's Society's "desire to be rid of Taylor." Pl. Br. 24. But this is an *ipse dixit*. Taylor has not come forward with any evidence to refute Seamen's Society's showing that Singh was terminated because he was "an on-call driver who was paid full time, even when his services were not needed," and that Seamen's Society could not "financially justify maintaining his position." Def. 56.1 ¶ 92; Vomero Aff. ¶ 26. Nor has she come forward with evidence refuting that Hendrick, another long-term employee, was terminated because "there was not enough work in the Administrative Offices to justify" an office manager position. Def. 56.1 ¶ 93; Vomero Aff. ¶ 27. Although Hendrick testifies that she "had a great deal of experience in administration" and could have "provided much needed assistance in Human Resources, Foster Care and Development," Hendrick Aff. ¶ 32, her testimony does not support Taylor's thesis that Seamen's Society

terminated Hendrick and Singh as a ruse to camouflage its racially-motivated termination of Taylor.  On the evidence at hand, a reasonable jury could not so find.

There is, therefore, no evidence to support Taylor's claims that defendants' proffered rationales for termination were pretext for unlawful discrimination, or that her race contributed to Seamen's Society's decision to terminate her.  *See Holtz*, 258 F.3d at 78.  Because a reasonable jury could not find racial discrimination, the Court grants Seamen's Society's motion for summary judgment on Taylor's Title VII discrimination claim.

### C.    Race Discrimination Under the NYSHRL and NYCHRL

Seamen's Society also moves for summary judgment on Taylor's race discrimination claims brought under the NYSHRL and NYCHRL.  Each makes it unlawful "[f]or an employer . . . because of an individual's . . . race . . . to discharge from employment . . . or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296; N.Y. City Admin. Code § 8–107.

"[C]laims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII."  *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 (2d Cir. 2011) *cert. denied*, 132 S. Ct. 1744 (2012) (citing *Torres v. Pisano,* 116 F.3d 625, 629 n.1 (2d Cir.1997)).  Accordingly, the Court grants summary judgment in favor of Seamen's Society on Taylor's NYSHRL race discrimination claim.

Race discrimination claims brought under the NYCHRL, however, are subject to a more liberal construction than those brought under federal or state law.  The NYCHRL "requires that courts give the statute an independent and more liberal construction than its federal and state counterparts."  *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 257 (E.D.N.Y. 2012) *aff'd*, 713 F.3d 163 (2d Cir. 2013); *see also Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278

(2d Cir. 2009) ("[C]laims under the City HRL must be reviewed independently from and 'more liberally' than their federal and state counterparts."); *Albunio v. City of N.Y.*, 16 N.Y.3d 472, 478–79 (2011) (NYCHRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible"); *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 30 (1st Dep't 2009) ("[C]ourts [must] be sensitive to the distinctive language, purposes, and method of analysis required by the [NYCHRL], requiring an analysis more stringent than that called for under either Title VII or the [NYSHRL].").

Notwithstanding this more liberal standard of review, "[o]ur consideration of claims brought under the state and city human rights laws parallels the analysis used in Title VII claims." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 (2d Cir. 2000). Under that framework, Taylor would still have to demonstrate:  (1) membership in a protected class, (2) qualifications for the position, (3) an adverse employment action, and (4) circumstances giving rise to an inference of discrimination. *Bucalo*, 691 F.3d at 129. For the reasons stated above, Taylor fails to establish the fourth prong:  There is not evidence in the record sufficient to support an inference that her termination resulted from racial discrimination. Accordingly, the Court also grants summary judgment in favor of Seamen's Society on Taylor's NYCHRL race discrimination claim.

### D.      Retaliation Under Title VII

Taylor also brings a claim against Seamen's Society for unlawful retaliation. Under Title VII, it is unlawful for an employer to discriminate against an employee because that employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The statute thus

"prohibits an employer from taking materially adverse action against an employee because the employee opposed conduct that Title VII forbids or the employee otherwise engaged in protected activity." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011) (citation omitted).  Title VII is violated when "a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause." *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993).  Title VII's anti-retaliation provision is designed "to further [the Act's] goal of a workplace free from [unlawful] discrimination," *Tepperwien*, 663 F.3d at 567, "by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of [Title VII's] basic guarantees," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).

"In adjudicating retaliation claims, courts follow the familiar burden-shifting approach of *McDonnell Douglas Corp.*" *Jute*, 420 F.3d at 173.  To prove a *prima facie* case of retaliation, a plaintiff must establish that:  (1) she participated in a protected activity; (2) participation in the protected activity was known to the employer; (3) the employer thereafter subjected her to a materially adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action.  *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).  The burden of proof at the *prima facie* stage has been characterized as "de minimis."  *Hicks*, 593 F.3d at 166.

If this initial burden is met, "a presumption of retaliation arises," and the burden shifts to "the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action."  *Id.* (citing *Quinn*, 159 F.3d 759 at 768).  If the employer produces evidence of a non-retaliatory justification for the adverse employment action, then the employee must, in order to avoid summary judgment, "show that retaliation was a substantial reason for the adverse

employment action" or that the proffered legitimate, non-retaliatory reason was pretextual. *Id.* (citation omitted).

In her retaliation claim, Taylor alleges that she engaged in protected activity when she sent letters to her supervisors alleging discrimination in January 2009 and January 2010, and when she filed her first EEOC Charge on June 14, 2010.  She alleges that, as a result of this activity, Seamen's Society terminated her employment.  Seamen's Society concedes that Taylor has established the first three prongs of a *prima facie* case for retaliation:  She engaged in a protected activity by sending letters and by filing a complaint of discrimination with the EEOC; this protected activity was known to Seamen's Society; and Seamen's Society thereafter subjected her to a materially adverse employment action (termination).

In moving for summary judgment on this claim, Seamen's Society argues that: (1) Taylor cannot establish a *prima facie* case of retaliation because there was no causal connection between Taylor's protected acts and her termination; and (2) Seamen's Society has put forth a neutral justification for Taylor's termination, which Taylor has failed to show was mere pretext for retaliation.

### 1.   As to her termination, Taylor has not established a causal nexus

To establish a *prima facie* case for retaliation under Title VII, Taylor must adduce evidence showing that the letters she sent and the filing of EEOC Charge I influenced Seamen's Society's decision to terminate her employment.  "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Univ. of Tex. SW Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

Causation of an adverse employment action traceable to a protected activity may be established "either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Hicks*, 593 F.3d at 170 (citation omitted); *see also Milne v. Navigant Consulting, Inc.*, No. 08 Civ. 8964 (PAE), 2012 WL 3283454, at *8 (S.D.N.Y. Aug. 13, 2012) (citation omitted).  In addressing this issue, "the court's role . . . is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute*, 420 F.3d at 173 (citing *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987)).

Here, Taylor does not point to any direct evidence of retaliatory animus, and instead relies on indirect evidence: (1) the alleged temporal proximity of events; and (2) Opsha's alleged disparate treatment of Taylor and Montalvo.  The Court evaluates these claims in turn.

### a.   Temporal proximity here does not demonstrate causation

 The occurrence of an adverse employment action shortly after protected conduct may give rise to an inference of causation.  "Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action." *Kaytor,* 609 F.3d at 552; *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be 'very close.'") (citation omitted).

Taylor argues that such proximity exists here.  But the latest protected act relied upon by Taylor is EEOC Charge I, which was submitted on June 14, 2010.  Taylor was terminated 11 months later, on May 16, 2011.  The temporal gap between these two events is too large to create the requisite inference of causal connection.  *See, e.g.*, *Lioi v. New York City Dep't of Health & Mental Hygiene*, 914 F. Supp. 2d 567, 592 (S.D.N.Y. 2012) (temporal nexus of ten months between protected activity and discriminatory treatment "is insufficient to establish causal connection"); *Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 456–58 (S.D.N.Y. 2012) (three- to six-month gap insufficient to establish causal connection); *see also Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) ("district courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation").  The Court therefore rejects Taylor's attempt to infer causation due to the alleged "temporal proximity" between Taylor's EEOC Charge I and her termination.

### b. Disparate treatment of employees does not demonstrate causation

Taylor's other argument is that Seamen's Society's disparate treatment of her relative to Montalvo demonstrates retaliation on the basis of Taylor's protected conduct.  *See* Pl. Br. 23.  To support this contention, she points to Opsha's "unnecessary written disciplinary actions" towards her and to "various adverse employment actions" against her.  *Id.*

For the reasons reviewed above, Montalvo and Taylor were not similarly situated.  *See* Section III.B.1.b, *supra*.  But even if they were, as to disciplinary measures, the record evidence establishes that Taylor was not treated more harshly than Montalvo.  Taylor received two written counselings, while Montalvo received five written disciplinary actions, and was subject to a 30-day probationary period for excessive absenteeism.  Def. 56.1 ¶ 99; Opsha Aff. ¶ 6.  Although

Taylor was terminated and Montalvo was not, Seamen's Society has convincingly shown that Taylor's termination was not occasioned by any workplace failings on her part, but was instead brought about by a reduction in force that coincided with further automation of the ADP payroll system.  Because Montalvo worked in Accounts Receivable rather than Payroll, *see* Pl. 56.1 ¶ 215, an inference of retaliation cannot be drawn from the mere fact that Taylor was terminated and Montalvo was not.

Because Taylor has not come forward with evidence that her protected acts influenced Seamen's Society's decision to terminate her employment, no trier of fact could find a causal nexus between her protected activity and her termination.  Accordingly, Taylor fails to make out a *prima facie* case for retaliation.

### 2.  Seamen's Society has put forward a neutral justification for Taylor's termination

Even if Taylor could establish a *prima facie* case of retaliation, however, the burden would then shift to defendants to provide a legitimate, non-retaliatory reason for her termination.  *See Jute*, 420 F.3d at 173.  Defendants have carried that burden.  As chronicled earlier, there is strong evidence that Seamen's Society terminated Taylor's employment not because of factors particular to her or her work performance, but because her position became redundant as a result of the payroll system upgrade and because of a broader workforce reduction caused by budgetary constraints.  *See* Section III.B.2, *supra*.  There is simply no evidence that the reduction in force in May 2011 was motivated by a desire to retaliate against Taylor for her earlier protected activities, the last of which occurred in June 2010.  Seamen's Society has put forward a neutral, and indeed an amply corroborated, justification for Taylor's termination pursuant to *McDonnell Douglas*.

### 3.   Taylor has failed to show that Seamen's Society's neutral justifications are pretextual

Because defendants have shown a legitimate, non-discriminatory reason for Taylor's termination, to avoid summary judgment, Taylor must adduce evidence sufficient to permit a reasonable jury to conclude that her protected acts were a substantial reason for her termination, or that Seamen's Society's explanation is merely a pretext for impermissible retaliation.  Taylor has failed to do so.  The documentary and testimonial evidence uniformly establishes that Seamen's Society terminated seven other employees in the 2011 reduction in force, including Hendrick, a Caucasian administrative employee with as many years of service as Taylor.  As discussed above, Taylor's suggestion that Hendrick was terminated as pretext to camouflage Seamen's Society's true intention—to rid themselves of Taylor, in retaliation for her prior protected activities—is uncorroborated and, on the summary judgment record, incredible.  *See* Section III.B.3, *supra*.

Taylor has failed to present any evidence that the legitimate reasons defendants have identified for Taylor's termination was a pretext for unlawful retaliation under Title VII.  Accordingly, the Court grants Seamen's Society's motion for summary judgment on Taylor's Title VII retaliation claim.

### E.   Retaliation Under the New York State Human Rights Law and the New York City Human Rights Law

Taylor also brings claims for retaliation under the NYSHRL and the NYCHRL.  Section 296(7) of the NYSHRL makes it unlawful for:

> any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article.

N.Y. Exec. Law § 296(7).  "Courts apply the same standard used in Title VII cases in analyzing

NYSHRL retaliation claims."  *Caban v. Richline*, No. 10 Civ. 559 (ALC), 2012 WL 2861377, at

*14 (S.D.N.Y. July 10, 2012) (citing *Patane*, 508 F.3d at 115–17).  Accordingly, the above

analysis of Taylor's retaliation claim under Title VII applies in full here.  The Court grants

Seamen's Society's motion for summary judgment on Taylor's NYSHRL retaliation claim.

Section 107(7) of the NYCHRL makes it unlawful for:

> any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, (iv) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title, or (v) provided any information to the commission pursuant to the terms of a conciliation agreement made pursuant to section 8-115 of this chapter.

N.Y.C. Admin. Code § 8-107(7).  The "but for" causation standard from *Nassar* applies to

Taylor's Title VII and NYSHRL retaliation claim, but not to her retaliation claim under the

NYCHRL.  *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 116 (2d Cir.

2013) (under the NYCHRL "summary judgment is appropriate only if the plaintiff cannot show

that retaliation played any part in the employer's decision").  Liability for retaliation under the

NYCHRL is also broader than under the companion federal and state statutes, "in that there is no

requirement that the employee suffer a materially adverse action."  *Pilgrim v. McGraw-Hill Cos.*,

599 F. Supp. 2d 462, 469 (S.D.N.Y. 2009); *see also Fincher*, 604 F.3d at 723 ("New York State

courts and district courts in this Circuit have concluded . . . that the retaliation inquiry under the

CHRL is 'broader' than its federal counterpart.").  However, a plaintiff claiming retaliation under

the NYCHRL must still show that her employer was aware she engaged in a protected activity,

and that there was a causal connection between the protected activity and the employer's

subsequent action. *Pilgrim*, 599 F. Supp. 2d at 469; *Dixon v. Int'l Fed'n of Accountants*, 416 F.

App'x 107, 110 n.1 (2d Cir. 2011) (summary order) (despite broader standard governing

NYCHRL claims, retaliation claim fails as a matter of law where plaintiff can produce no

admissible evidence of a causal connection between her protected activity and any adverse

action).

For the reasons discussed above, no reasonable jury could find, based on the evidence in

the record, that retaliation played any part in Seamen's Society's decision to terminate Taylor.

Accordingly, the Court also grants Seamen's Society's motion for summary judgment on

Taylor's NYCHRL retaliation claim.

## CONCLUSION

For the foregoing reasons, Seamen Society's motion for summary judgment is granted as

to Taylor's race discrimination and retaliation claims under Title VII, the NYSHRL, and the

NYCHRL. The Clerk of Court is directed to terminate the motion at docket number 27 and to

close this case.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: December 16, 2013
      New York, New York